# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| LINCOLNSHIRE POLICE PENSION FUND, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) ) | |
| Plaintiff, | ) ) | Docket No. 1:19-cv-2045 |
| v. | ) ) | **CLASS ACTION COMPLAINT** |
| BANK OF AMERICA, N.A.; BARCLAYS BANK PLC; BARCLAYS CAPITAL INC.; BNP PARIBAS SECURITIES CORP.; CITIGROUP GLOBAL MARKETS INC.; CREDIT SUISSE AG; CREDIT SUISSE SECURITIES (USA) LLC; DEUTSCHE BANK AG; DEUTSCHE BANK SECURITIES INC.; FIRST TENNESSEE BANK, N.A.; FTN FINANCIAL SECURITIES CORP.; GOLDMAN SACHS & CO. LLC; JPMORGAN CHASE BANK, N.A.; JPMORGAN SECURITIES LLC; MERRILL LYNCH, PIERCE, FENNER & SMITH INC.; AND UBS SECURITIES LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ) | |

The Lincolnshire Police Pension Fund ("Plaintiff"), individually and on behalf of all others similarly situated, complains upon knowledge as to its own acts and upon information and belief as to all other matters, against Defendants (defined below) for their violations of law from at least January 1, 2009 through April 27, 2014 (the "Class Period") as follows:

## INTRODUCTION

1.      Conspiring in restraint is a violation the Sherman Act, the "Magna Carta of free enterprise."[1]

2.      The Federal National Mortgage Association ("Fannie Mae") and Federal Home Loan Mortgage Corporation ("Freddie Mac") were created by Congress to perform an important role in the nation's housing finance system – to provide liquidity, stability and affordability to the mortgage market.[2] They provide liquidity (ready access to funds on reasonable terms) to the thousands of banks, savings and loans, and mortgage companies that make loans to finance housing.

3.      When operating in a transparent and efficient market, Fannie Mae and Freddie Mac help stabilize mortgage markets and protect housing during extraordinary periods when stress or turmoil in the broader financial system threaten the economy.

4.      To ensure that they are able to complete their mission, Freddie Mac and Fannie Mae maintain a stringent application process in selecting the companies for the privilege of joining their select Dealer Groups, which support Reference Bills Securities, Discount Notes Securities, Medium Term Notes and Reference Notes Securities.[3]

5.      The goal of that application and selection process "is to develop a diverse supply chain and ensure *inclusion and transparency* in the procurement of goods and services that support Freddie Mac's key lines of business and operations." (emphasis added).[4]

---

[1] *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972).

[2] https://www.fhfa.gov/SupervisionRegulation/FannieMaeandFreddieMac/Pages/About-Fannie-Mae---Freddie-Mac.aspx.

[3] http://www.freddiemac.com/debt/products/dealer-groups.html.

[4] http://www.freddiemac.com/about/people/suppliers.html.

6.    Defendants, who are horizontal competitors and the dominant dealers in the above-referenced financial instruments and selected through this application process, conspired to fix prices and restrain competition in the market for unsecured bonds issued by Fannie Mae and Freddie Mac, rather than maintain the requisite transparency.

7.    These unsecured bonds are collectively referred to herein as "FFBs." FFBs refer to unsecured issuances, and do not include mortgage-backed securities issued by Fannie Mae and Freddie Mac.[5]

8.    Since the companies that are allowed to market the FFBs are selected through an application process, the selected entities, including Defendants, control the FFB supply ultimately available to investors. Defendants exploited that control to establish an opaque secondary market to facilitate collusion and reap supra-competitive profits at the expense of their own clients (Plaintiff and the Class).

9.    Prosecutors from the U.S Justice Department's ("DOJ") antitrust division and criminal division are currently investigating Defendants' misconduct. The antitrust bureau is investigating their collusion to fix prices, while the criminal division is responsible for prosecuting fraud charges. The investigation focuses on antitrust and fraud violations in connection with the activities of the Defendants in the $550 billion secondary market.[6]

10.    The secondary market for FFBs is a vast "over-the-counter" ("OTC") market. In order to buy or sell FFBs, investors typically communicate directly with a salesperson or trader employed by a dealer through a computer network and/or by phone to receive a price quote. The

---

[5] Collectively, the two government-backed mortgage-finance companies have about $548 billion of the securities outstanding.

[6] https://www.bloomberg.com/news/articles/2018-06-01/trading-in-fannie-freddie-bonds-is-said-to-be-probed-by-u-s.

OTC market for FFBs is therefore not a transparent market. As such, it enables only a few select, knowledgeable, and privileged dealers (such as the Defendants) to collude and harm investors.

11.    When customers want to buy or sell FFBs in the secondary market, they ask a dealer for a quote. The dealer, in turn, gives the customer a "bid," the price it would pay for the bond, or an "ask," the price at which it would sell the bond. The difference between the bid and ask—known as the "bid-ask spread"—is the basis for dealers' profits. Dealers seek to buy bonds at low prices and sell them at higher prices.

12.    Prior to the financial crisis, the volume of FFB issuances had risen steadily for years and dealers were able to earn healthy profits underwriting FFB issuances and trading the bonds on the secondary market. After the financial crisis the volume of new issuances began to decline, which resulted in reduced profits for the Defendants' desks underwriting and trading FFBs.

13.    Rather than adapt to the new reality by developing ways to compete, Defendants adjusted by unlawfully manipulating it in their favor. Instead of competing for customers' business by tightening spreads, which benefits customers but reduces the Defendants' profits, Defendants conspired to manipulate the prices and spreads of FFBs.

14.    The economic facts indicate an agreement by Defendants to charge inflated, supra-competitive prices for *newly issued* FFBs that they sold to investors after acquiring them from Fannie Mae or Freddie Mac. Inflating prices after FFB issuances was lucrative for Defendants because a large volume of their FFB sales occurred in the week following an FFB issuance. Consequently, each Defendant had the common motive to inflate the prices of these products by charging agreed-upon, supra-competitive prices to investors.

15.    Economic facts indicate that Defendants coordinated to inflate the prices of *older* FFBs in the days prior to each new FFB issuance. This was done in order to drive the market price of soon to be released FFBs to an artificially higher price by establishing an inflated benchmark for comparison. Both the inflated price on the older FFBs and the artificially-priced new FFBs allowed Defendants to reap unlawful profits once they had new FFB inventory to sell.

16.    Defendants' agreement to restrain trade in the FFB market is another instance of collusion and price-fixing in financial markets by these same Defendants during the same period of time. Given the persistent, pervasive, and secretive nature of Defendants' conspiracy, as well as the pendency of ongoing government investigations into the misconduct alleged herein, Plaintiff anticipates that further evidentiary support for its claims will be unearthed after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction over this action pursuant to Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, respectively, and pursuant to 28 U.S.C. § 1331.

18.    Venue is proper in this District, pursuant to, among other statutes, Sections 4, 12, and 16 of the Clayton Act; 15 U.S.C. §§ 15, 22, and 26; and 28 U.S.C. § 1391(b), (c) and (d). During the Class Period, each Defendant resided, transacted business, was found, or had agents in the District; a substantial portion of the events or omissions giving rise to Plaintiff's claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District, as more particularly alleged below. Defendants Barclays Capital Inc., Merrill Lynch Pierce Fenner & Smith, Inc., Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, Deutsche Bank Securities Inc., Goldman

Sachs & Co. LLC, JPMorgan Chase Bank, N.A., J. P. Morgan Securities LLC, BNP Paribas

Securities Corp., and UBS Securities LLC are headquartered in this District. Defendants

Barclays Bank PLC, First Tennessee Bank, National Association, FTN Financial Securities

Corp, and Credit Suisse AG conduct business in this District through their subsidiaries as agents

and through branch offices located in this District, as more particularly alleged below.

19.    This Court has personal jurisdiction over each Defendant. As alleged below, a

substantial part of the events giving rise to Plaintiff's claims occurred in this District and the

United States. Defendants conspired to fix the prices of FFBs that Defendants traded in this

District and with customers located in the United States. Defendants' price-fixing conspiracy

harmed investors in this District and throughout the United States by causing them to pay more

for their FFB purchases and receive less for their FFB sales than they would have in a

competitive market.

20.    Defendants, either themselves or through their subsidiaries as agents, purposefully

availed themselves of doing FFB business in the United States and in this District by, *inter alia*:

(a) enacting their conspiracy here by charging artificial, agreed-upon prices in FFB transactions

with investors in this District and throughout the United States; and (b) collecting unlawful

overcharges from investors in this District and throughout the United States.

## **PARTIES**

21.    Plaintiff Lincolnshire Police Pension Fund ("Plaintiff") is a defined benefit plan

established pursuant to Article 3 of the Illinois Pension Code for the benefit of police officers

employed by the Village of Lincolnshire and their beneficiaries.  It is located in Lincolnshire,

Illinois.  Throughout the Class Period, Plaintiff participated in FFB transactions directly with one

or more of the Defendants.  Plaintiff suffered monetary losses when it was overcharged or

underpaid in these transactions as a direct result of Defendants' conspiracy to fix the prices of FFBs.

22.    **Barclays**: Defendant Barclays Bank PLC, operating under the trade name "Barclays Investment Bank," is headquartered in London, England and provides investment banking advisory services, foreign exchange securities lending, and loan syndication services through at least three offices in the United States, including its New York Branch located in this District. Barclays Bank PLC's macro market line of business is supported by trading desks that specialize in dealing FFBs. Barclays Bank PLC is a direct, wholly-owned subsidiary of Barclays PLC, a multinational financial services corporation.

23.    Defendant Barclays Capital Inc. ("BCI") is a wholly-owned subsidiary of Barclays Bank PLC, incorporated in the state of Connecticut, with its headquarters in New York, New York and domestic branch offices in at least 15 other U.S. cities. BCI is the main U.S. broker-dealer entity for the Barclays group of entities and is a U.S. registered securities broker-dealer with the SEC; a futures commission merchant, a commodity pool operator, a commodity trading advisor registered with the Commodity Futures Trading Commission ("CFTC"); and a municipal advisor registered with the SEC. BCI is registered as a "4(k)(4)(E)" securities subsidiary under the Bank Holding Company Act, which permits it to engage in securities underwriting, dealing, and market-making activities.

24.    BCI's activities include transactions in asset-backed securities, agency mortgage-backed securities, debt securities, other corporate related securities, equities, resale and repurchase agreements, securities lending and borrowing, and clearing derivative products. It is an approved dealer for both Fannie Mae and Freddie Mac, providing BCI access to FFB supply through the FFB Issuance Process. As of December 31, 2017, BCI held $8.5 billion in agency

securities, a category that includes FFBs.[7] During the Class Period, BCI employees located in this District priced, marketed, and dealt FFBs to members of the Class.

25.     BCI performed its FFB business in the United States and in this District with the knowledge and consent of, for the benefit of, and under some control by Barclays Bank PLC as alleged below.

26.     BCI conducts FFB-related activities, including FFB dealing with investors, as part of Barclays Bank PLC's "Barclays Investment Bank" division. Barclays Investment Bank (which includes both Barclays Bank PLC and BCI) maintains a website in the United States where it advertises that "[w]e serve our institutional investor clients by helping them to understand developments in global markets and offering execution and risk management tools across each major asset class." One of the ways in which Barclays Bank PLC serves its institutional investor clients is by transacting in FFBs with investors like Plaintiff through its wholly-owned subsidiary and main broker-dealer in the Barclays Investment Bank division, BCI. For example, Barclays Bank PLC wrote that Barclays Investment Bank "integrates our primary offering capabilities on behalf of issuer clients (*e.g.*, BCI's FFB underwriting activities in the FFB Issuance Process) with ***our*** secondary trading capabilities on behalf of ***our*** investor clients (*e.g.*, BCI's FFB transactions with investors including Treasury)" (emphasis added). These allegations show that BCI transacted in FFBs in the United States with the knowledge and consent of Barclays Bank PLC.

27.     BCI conducted FFB-related activities for the benefit of Barclays Bank PLC, including from its headquarters in this District. Barclays PLC, the ultimate parent of both BCI

---

[7] The terms "agency securities" and "agency bonds" are catch-all terms used to refer to debt instruments issued by agencies of the United States government and entities it sponsors, such as Fannie Mae and Freddie Mac. These terms include FFBs.

and Barclays Bank PLC, reports its results on a consolidated basis and describes its operations using the term "Barclays or Group" to refer to "Barclays PLC together with its subsidiaries." In its financial reports, Barclays PLC consolidates trading revenues generated by BCI and Barclays Bank PLC, including transactions in FFBs, in the entry "net trading income." Barclays PLC also incentivized BCI employees to perform activities on its behalf, including trading in FFBs with investors, by establishing a share-based compensation plan that rewards BCI employees with shares of Barclays PLC stock based on performance.

28.    Barclays Bank PLC exercises control over BCI. For example, Gerard LaRocca is President of BCI, but is also the New York branch manager of Barclays Bank PLC's New York office. In mid-March 2012, Barclays Bank PLC reorganized BCI to absorb it into its Barclays Investment Bank division. Barclays Investment Bank is a division of Barclays Bank PLC that includes BCI's FFB-related activities. Barclays Investment Bank maintains a New York headquarters at 745 7th Avenue in New York, NY. BCI is headquartered at the same location in the same office. The Global Head of Market Risk, who is responsible for managing risk across all of Barclays Bank PLC's Barclays Investment Bank division, also manages market risk for BCI and is a Board Director of BCI. Edvard "Ed" Olsen is the Managing Director and Head of Compliance for Barclays Bank PLC's Barclays Investment Bank division, and is also the Chief Compliance Officer for BCI, demonstrating that Barclays Bank PLC exercises control of compliance and oversight functions for BCI. BCI staff report to senior managers in Barclays Bank PLC's Barclays Investment Bank division, who monitor their performance and make decisions concerning their compensation and advancement.

29.     Barclays Bank PLC also determines and publishes the terms that apply to BCI's FFB transactions with investors in the United States, further demonstrating Barclays Bank PLC's control over BCI's FFB trading and sales activities in this District and the United States.

30.     **Bank of America/Merrill Lynch**: Defendant Bank of America, N.A. ("BANA") is an American global bank and financial services company incorporated in Delaware and headquartered in Charlotte, North Carolina with operations in all 50 states. Bank of America Corporation, the parent company of BANA, completed its purchase of Defendant Merrill Lynch, Pierce, Fenner, & Smith, Inc. ("Merrill Lynch") on January 1, 2008 and continued operating its debt and equity underwriting sales and trading business after that date by merging Merrill Lynch with Bank of America Corporation's former broker-dealer subsidiary, Banc of America Securities LLC. Bank of America Corporation also assumed all liabilities and obligations of Merrill Lynch on October 1, 2013.

31.     Bank of America Corporation reports its financial position on a consolidated basis, which includes the activities of both BANA and Merrill Lynch. As of December 31, 2017, Bank of America Corporation held over $440 billion in debt securities, including FFBs. During the Class Period, Bank of America Corporation performed investment banking activities, including dealing FFBs to investors, through its wholly-owned subsidiary Merrill Lynch.

32.     Defendant Merrill Lynch is a wholly-owned indirect subsidiary of Bank of America Corporation and a corporate affiliate of BANA. Merrill Lynch is incorporated in Delaware, with its principal place of business in New York, New York. Merrill Lynch acts as a broker and a dealer in the purchase and sale of various financial instruments, including FFBs throughout the United States and in this District. It provides underwriting services and is registered as a broker-dealer and investment advisor with the SEC. Merrill Lynch is the primary

broker-dealer for the Bank of America Corporation corporate family, including BANA, and prices, markets, and sells FFBs on behalf of BANA.

33.     As of December 31, 2017, Merrill Lynch held over $440 billion in U.S. Treasury and government agency securities, a category that includes FFBs. Merrill Lynch was an approved dealer for both Fannie Mae and Freddie Mac throughout the Class Period.

34.     Bank of America Corporation is responsible for internal controls, compliance, and oversight for both BANA and Merrill Lynch. It handles "Fixed Income Compliance," which includes monitoring and detecting unlawful conduct within Merrill Lynch's and BANA's sales and trading businesses, including Merrill Lynch's and BANA's FFB dealing activities.

35.     **Citi**: Citigroup, Inc. is a global banking institution headquartered in New York, New York. It is the ultimate parent of its wholly-owned dealer-subsidiary, Defendant Citigroup Global Markets Inc. ("CGMI"). As of December 31, 2017, Citigroup Inc. reported that "fair value levels" of all "U.S. Treasury and federal agency securities" held by itself and its subsidiaries (including CGMI) was approximately $21 billion.

36.     CGMI is a New York corporation with its principal place of business in New York, New York. CGMI has been registered with the SEC since 1960 as both an investment adviser and a broker-dealer. CGMI currently has approximately 43,000 advisory accounts and $22 billion USD in regulatory assets under management.[8] During the Class Period, CGMI dealt FFBs to investors from offices located in this District.

---

[8] The SEC defines regulatory assets under management as "securities portfolios for which you provide continuous and regular supervisory or management services."

37.     Citigroup Inc. manages internal controls, oversight, and compliance for CGMI. In this capacity, it is responsible for monitoring CGMI's activities and detecting violations of law, including CGMI's FFB-related activities.

38.     As of June 18, 2018, CGMI reported that it has assets of approximately $17 billion in U.S. Treasury and federal agency securities (a category that includes FFBs), and over $20 billion in liabilities of the same.

39.     **Credit Suisse**: Defendant Credit Suisse AG ("CS AG") is a multinational banking and financial services company which engages in banking, finance, consultancy, and trading activities in the United States and worldwide. CS AG has a primary U.S. office located in New York, New York referred to as "Credit Suisse AG, New York Branch." Credit Suisse AG, New York Branch ("CS NY") is a legal and operational extension of CS AG in the United States and is not a separately incorporated entity. CS NY is a primary dealer in U.S. government securities and trades with the Federal Reserve Bank of New York in this District in agency debt, which includes FFBs. Through its New York Branch, CS AG serves as a dealer in U.S. government and agency securities, including FFBs.

40.     CS AG has direct and indirect subsidiaries based in the United States, including Defendant Credit Suisse Securities (USA) LLC. CS AG is registered to do business in New York with the New York State Department of Financial Services. As of October 2017, CS AG held over $1 billion in FFBs.

41.     Defendant Credit Suisse Securities (USA) LLC ("CS Securities") is a wholly-owned subsidiary of Credit Suisse AG, organized under the laws of Delaware with its principal place of business in New York, New York. CS Securities is a "Material Legal Entity" according to CS AG's latest U.S. Resolution Plan, described as the "U.S. broker dealer" and "main U.S.

12

operating company" of CS AG. It is a U.S. registered broker-dealer, providing capital raising, market making, advisory, and brokerage services. It is an underwriter, placement agent, and dealer for money market instruments, mortgage and other asset-backed securities, as well as a range of debt, equity, and other convertible securities of corporations and other issuers. Until November 2017, CS Securities was a primary dealer in U.S. government securities. In November 2017, CS Securities transitioned its primary dealer license and a substantial portion of its U.S. Government and Agency Primary Dealership, secondary market trading, and repo market making to Credit Suisse AG, New York Branch. CS Securities is an approved dealer for both Fannie Mae and Freddie Mac, ensuring access to FFB dealing inventory that it used in transactions with investors.

42.     CS AG manages internal controls, oversight, and compliance for CS Securities. In this capacity, it is responsible for monitoring CS Securities' activities and detecting violations of law, including CS Securities' FFB dealing activities.

43.     **Deutsche Bank**. Deutsche Bank AG ("DB AG") is a multinational bank that provides services in commercial banking, investment banking, and retail banking, as well as wealth and asset management products to corporations, governments, institutional investors, small and medium-sized businesses, and private individuals. DB AG engages in U.S. banking activities directly through its New York branch, which is based in this District. It also operates in this District through its U.S.-based subsidiary including Deutsche Bank Securities Inc. DB AG describes Deutsche Bank Securities Inc. as its "principal U.S. SEC-registered broker-dealer subsidiary." As of October 2018, DB AG held $361 million in FFBs.

44.     Defendant Deutsche Bank Securities Inc. ("DB Securities"), formerly known as Deutsche Banc Alex. Brown Inc. is a wholly-owned subsidiary of Deutsche Bank AG. It is

incorporated in Delaware with its principal place of business in New York, New York. DB Securities is a registered securities broker-dealer and investment advisor with the SEC, a futures commission merchant with the CFTC, and a member of FINRA. DB Securities provides capital raising, market making, and brokerage services for its governmental, financial institution, and corporate clients. As of December 31, 2017, DB Securities held over $2 billion in U.S. Government agency obligations, a category that includes FFBs. DB Securities is an approved dealer for both Fannie Mae and Freddie Mac, ensuring access to FFB inventory to trade with investors. During the Class Period, DB Securities employed trading and sales staff who priced, marketed, and dealt FFBs to members of the Class from within this District.

45.     DB AG manages internal controls, oversight, and compliance for DB Securities and all other DB AG subsidiaries. In this capacity, it is responsible for monitoring DB Securities' activities and detecting violations of law, including by DB Securities' FFB dealing businesses.

46.     **Goldman Sachs**: Defendant Goldman Sachs & Co. LLC ("Goldman Sachs") is a wholly-owned subsidiary of Goldman Sachs Group Inc., organized under New York Law with its principal place of business in New York, NY. Goldman Sachs is a registered broker-dealer with the SEC and trades financial products in all 50 states and the District of Columbia. It is registered with the CFTC as a futures commission merchant and a swap dealer. As of December 2016, Goldman Sachs held over $44 billion in U.S. government and federal agency obligations, a category that includes FFBs. Goldman Sachs is an approved dealer for both Fannie Mae and Freddie Mac, ensuring access to FFB inventory.

47.     During the Class Period, Goldman Sachs employed FFB trading and sales staff based in the United States and in this District, who priced, marketed, and dealt FFBs to investors.

48.     Goldman Sachs Execution & Clearing, L.P. was a wholly-owned subsidiary of Goldman Sachs Group, Inc. that offered trade execution and clearing services to other subsidiaries within the Goldman Sachs brand. Goldman Sachs Execution & Clearing, L.P. also executed FFB trades with Plaintiff and/or members of the Class at artificial prices during the Class Period, until it was acquired by Goldman Sachs in or around August 2017.

49.     **JPMorgan:** Defendant JP Morgan Chase Bank, National Association ("JP MNA") is a wholly-owned "principal subsidiary" of JPMorgan Chase & Co., headquartered in New York, New York. It is a national banking association with branches in at least 23 U.S. states. As of February 2, 2018, JP MNA held over $1.7 billion in U.S. government agency and U.S. government-sponsored agency debt securities, a category that includes FFBs. During the Class Period, JP MNA traded FFBs with members of the Class from within this District.

50.     Defendant JPMorgan Securities LLC ("JPMS"), previously known as J.P. Morgan Securities Inc., is a Delaware limited liability company with its headquarters in New York. It is a wholly-owned and "principal" subsidiary of JPMorgan Chase & Co., which is also the parent company of JP MNA. JPMS is registered with the SEC as a broker-dealer and investment advisor and registered with the CFTC as a futures commission merchant. JPMS acts as a primary dealer in U.S. government securities, makes markets in FFBs, and clears OTC derivative contracts in connection with its corporate affiliates' market-making and risk management activities. JPMS is an approved dealer for both Fannie Mae and Freddie Mac, providing access to FFB inventory through the FFB Issuance Process that JPMS and its affiliates, including JP MNA, use when dealing FFBs to investors. During the Class Period, JPMS dealt FFBs to members of the Class from offices located in this District.

15

51.    On October 1, 2016, JPMS acquired J.P. Morgan Clearing Corp., which was known as Bear Stearns Securities Corp. until October 2008. J.P. Morgan Clearing Corp. offered execution and clearing services for corporations affiliated under the "JPMorgan" brand name, and, in that capacity executed FFB for trades members of the Class at artificial prices.

52.    JPMorgan Chase & Co. manages internal controls, oversight, and compliance for its subsidiaries including JP MNA and JPMS. In this capacity, it is responsible for monitoring JPMorgan Chase & Co.'s Fixed Income business unit, which encompasses JP MNA's and JPMS' FFB-related activities.

53.    **UBS**: UBS AG is a multinational banking and financial services corporation which engages in banking, financial, advisory, and trading service activities worldwide. It is headquartered in Basel, Switzerland. UBS AG maintains several branch and representative offices in the U.S. and is registered as a swap dealer with the CFTC. UBS AG reports that it conducts securities activities in the United States primarily through UBS Securities LLC. As of October 2018, UBS AG held over $304 million in FFBs.

54.    Defendant UBS Securities LLC ("UBS Securities") is an indirect, wholly-owned subsidiary of UBS AG with its principal place of business in New York, New York. It is a registered broker-dealer under the Securities Exchange Act of 1934 and is a member of the New York Stock Exchange, FINRA, NASDAQ, and other principal exchanges. UBS Securities provides a full range of investment banking services, including trading and sales and prime brokerage operations.

55.    As of December 31, 2017, UBS Securities held over $5.7 billion in U.S. government and agency obligations, a category that includes FFBs. UBS Securities is an approved dealer for both Fannie Mae and Freddie Mac, ensuring access to FFB inventory

through the FFB Issuance Process. During the Class Period, UBS Securities priced, marketed, and dealt FFBs to investors from offices located in this District.

56.    UBS AG manages internal controls, oversight, and compliance for UBS Securities. In this capacity, it is responsible for monitoring UBS Securities' activities and detecting violations of law, including by UBS Securities' FFB dealing businesses.

57.    **First Tennessee**: Defendant First Tennessee Bank, N.A. ("First Tennessee") is a financial services company based in Memphis, Tennessee. It operates a large debt capital markets division that focuses on public issuers such as Fannie Mae and Freddie Mac and on trading and selling debt instruments to institutional investors such as Plaintiff and members of the Class. First Tennessee calls this division "FTN Financial Capital Markets."

58.    First Tennessee is registered with the SEC as a broker-dealer in government securities. As of December 31, 2012, First Tennessee and its subsidiaries, including FTN Financial Securities Corp., held over $3 million in government agency securities, a category that includes FFBs. During the Class Period, either independently and/or through FTN Securities Corp., First Tennessee priced, marketed, and dealt FFBs to investors in this District during the Class Period.

59.    Defendant FTN Financial Securities Corp. ("FTN Financial") is a wholly-owned subsidiary of First Tennessee and operates as part of First Tennessee's FTN Financial Capital Markets division. It is one of the largest underwriters of FFBs and dealt FFBs to institutional investors.

60.    FTN Financial performed FFB business in this District with the knowledge and consent of, for the benefit of, and under some control by First Tennessee, as alleged below.

61.     Both First Tennessee and FTN Financial comprise First Tennessee's FTN "Financial Capital Markets division" and as such, conduct mutually beneficial FFB-related activities. First Tennessee acquires FFBs in the primary market by serving as an underwriter in the FFB Issuance Process. FTN Financial is described as "our capital markets business" on the Annual Report for First Tennessee and their mutual parent holding company, First Horizon National Corp. ("First Horizon"). In this capacity, FTN Financial provides FFB dealing services to investors, selling and trading FFBs acquired by First Tennessee. As described on the Annual Report, "FTN Financial provides a broad spectrum of financial services for the investment and banking communities through the integration of traditional capital market securities activities, loan sales, portfolio advisory services, and derivative sales."

62.     First Tennessee and FTN Financial operate as a single integrated unit, with operations by FTN Financial advertised under the same trade name and on the same website as First Tennessee. FTN Advisors is the trade name for wealth management products and services provided by First Tennessee and its affiliates. The FTN Advisors website represents itself as an advisor and seller of agency bonds, a category that includes FFBs. The FTN Financial website advertises that, "whether it's providing mortgage trading, underwriting agency debt, providing customized portfolio strategies or more, we serve approximately 4,700 institutional customers in more than 50 countries." The FTN Financial website boasts that "we are backed by $2.9 billion in capital as a division of First Tennessee Bank, N.A., which we don't hesitate to put behind every underwriting in which we participate," indicating that First Tennessee consented to and benefits from FTN Financials' FFB-related business activities.

63.     First Tennessee reports its results on a consolidated basis, under its holding company, First Horizon, which uses the overarching terms "our" and "we" to describe First

Tennessee and FTN Financial, with both explicitly listed as comprising "our core business." In its financial reports, First Horizon consolidates revenues generated by First Tennessee and FTN Financial.

64.    FTN Financial has a significant FFB-related business presence in this District. For example, its Research Division markets FFBs from offices located at FTN Financial's offices at 444 Madison Avenue, 9th Floor, New York, NY 10022.

65.    **BNP Paribas**: BNP Paribas S.A. ("BNPP SA") is one of the world's largest global banking organizations. It does business in 75 countries and employs over 180,000 people, including approximately 15,000 in the U.S. As of December 31, 2012, BNPP SA and its subsidiaries held approximately €69 trillion ($90 trillion) government bonds, a category that includes FFBs. In the year 2012, it sold €93 trillion ($121 trillion) in government bonds, including FFBs.

66.    Defendant BNP Paribas Securities Corp. ("BNP Securities") is an indirect, wholly-owned subsidiary of BNPP SA, headquartered in New York, New York. BNP Securities is a registered broker-dealer with the SEC. It is BNPP SA's "main broker dealer" in the U.S., and it is its most significant subsidiary in terms of assets, revenue, head count, and capital.

67.    BNP Securities is a primary dealer in U.S. government securities and an approved dealer for both Fannie Mae and Freddie Mac. BNP Securities traded FFBs with investors in the United States from offices located in this District during the Class Period. BNP Securities' broker- dealer business is composed overwhelmingly of highly liquid assets, including U.S. Treasury securities and agency debt (a category that includes FFBs).

68.    BNPP SA manages internal controls, oversight, and compliance for BNP Securities. In this capacity, it is responsible for monitoring BNP Securities' activities and detecting violations of law, including by BNP Securities' FFB dealing business.

69.    Defendants Merrill Lynch, JPMS, FTN Financial, CGMI, CS Securities, BCI, DB Securities, UBS Securities, Goldman Sachs, and BNP Securities are approved dealers for debt securities issued by both Fannie Mae and Freddie Mac. During the Class Period, these Defendants had access to FFB supply through the FFB Issuance Process that is described below, which they used to acquire FFB inventory to deal to investors. These Defendants are collectively referred to as "Approved FFB Dealer Defendants."

## SUBSTANTIVE ALLEGATIONS

## I.    BACKGROUND

### A.    Fannie Mae and Freddie Mac

70.    Fannie Mae and Freddie Mac are "government-sponsored entities" ("GSEs"). GSEs are financing entities created by Congress to fund loans to certain groups of borrowers such as homeowners, farmers and students.[9] Congress established Fannie Mae and Freddie Mac to provide liquidity, stability, and affordability to the mortgage market.[10] Both Fannie Mae and Freddie Mac provide liquidity to thousands of banks, savings and loans, and mortgage companies that make loans to finance housing.

71.    Fannie Mae and Freddie Mac finance operations by issuing FFBs. FFB issuances occur numerous times a month, typically in a predictable pattern based on a pre-determined

---

[9] http://www.freddiemac.com/debt/pdf/guide_gse_debtsecurities.pdf.

[10] https://www.fhfa.gov/SupervisionRegulation/FannieMaeandFreddieMac/Pages/About-Fannie-Mae---Freddie-Mac.aspx.

calendar. Typically, newly issued FFBs have characteristics similar or identical to those of existing FFBs.

72.    Each FFB issue is identified with a unique nine-digit alphanumeric code known as a Committee on Uniform Security Identification Procedures number ("CUSIP number"). The CUSIP number identifies specific provisions of each bond issue precisely, such as issuer, coupon, issue date, maturity, and call provisions.

## B.    Characteristics of FFBs

73.    All FFBs have fundamental similarities that distinguish them as a single class of issuances.

74.    FFBs are issued by Fannie Mae and Freddie Mac, and therefore carry substantially similar levels of "credit risk." Unlike U.S. Treasury bonds and bonds issued by certain federal agencies, FFBs are not backed by the full faith and credit of the United States government, meaning they are not guaranteed by the federal government. Credit risk is generally low for FFBs, however, because GSEs benefit from a perceived tie to the federal government as institutions established under federal legislation. Accordingly, debt issued by GSEs generally have high credit quality. The senior debt of the GSEs is rated AAA/Aaa, while the subordinated debt of Fannie Mae and Freddie Mac is rated AA-/Aa-.[11]

75.    FFBs are unregulated, unregistered OTC issuances that are exempt from the registration and disclosure provisions of the federal securities laws.

76.    FFBs have common features. These include face value, maturity, and coupon payment, explained below. Collectively, these characteristics are used to determine an FFB's

---

[11] http://www.freddiemac.com/debt/pdf/guide_gse_debtsecurities.pdf.

"yield to maturity," which is the annual return that the holder of an FFB earns from the instrument.

77.     The amount of money that Fannie Mae or Freddie Mac owes to the holder of an FFB upon maturity is known as the "face value," and the length of time between when an FFB is issued and when it matures is known as its "maturity." The most recently issued FFBs are known as "on-the-run" FFBs, while all other, older FFBs with similar characteristics are known as "off-the-run" FFBs.

78.     Most FFBs pay a fixed rate of interest or fixed coupon rate semi-annually. Some FFBs pay a variable or floating coupon rate that adjusts periodically based on a designated index. Fixed-rate FFBs have fixed interest rates and fixed maturities. If held to maturity, they preserve their principal and offer certainty of cash flow. Prior to maturity, however, the market value of fixed-rate FFBs fluctuates with changing interest rates. In a falling-rate environment, market values will rise, creating the potential for capital gains. In a rising-rate environment, prices will fall, creating the risk of loss when securities are sold prior to maturity.

79.     Medium-term FFBs[12] and long- term FFBs can also offer periodic interest payments known as "coupons." FFB coupon payments occur semi-annually and are calculated by multiplying the interest rate specified for the FFB by the FFB's face value.

80.     Short-term FFBs, or discount notes[13], do not offer coupon payments. Instead, short-term FFBs are issued at a discount to face value. The difference between the price paid and the face value due upon maturity represents the interest that the FFB purchaser earns in exchange for buying the short-term FFB.

---

[12] http://www.freddiemac.com/debt/products/mt-notes.html.

[13] http://www.freddiemac.com/debt/products/discount-notes.html.

81.    Most FFBs are non-callable or "bullet" bonds[14], but Fannie Mae and Freddie Mac also issue callable FFBs that can be redeemed by the issuer prior to maturity.

**C.    The FFB Market**

82.    Fannie Mae and Freddie Mac issue FFBs by selling them directly to an exclusive, pre-approved group of "Approved FFB Dealers." Approved FFB Dealers buy FFBs from Fannie Mae and Freddie Mac so that they can profit from trading FFBs with investors, such as Plaintiff and the Class, in the secondary market.

83.    Thus, the FFB market is structured as a three-tiered system with Fannie Mae and Freddie Mac at the top, Approved FFB Dealers in the middle, and investors like Plaintiff and the Class at the bottom.

84.    Fannie Mae and Freddie Mac issue FFBs using two methods. Most medium-term and long-term FFBs are issued in what is known as a "syndication." In a syndication, a subset of Approved FFB Dealers (known as a "syndicate") underwrites the FFB issuance together by agreeing to purchase the newly-issued FFBs from Fannie Mae or Freddie Mac.

85.    Fannie Mae and Freddie Mac also issue FFBs through private auctions. The only dealers who can purchase FFBs in auctions are Approved FFB Dealers. Collectively, FFB syndications and FFB auctions are referred to herein as the "FFB Issuance Process."

86.    Approved FFB Dealers profit from participating in the FFB Issuance Process by acquiring FFB inventory that they then sell to investors for profit.

---

[14] A bullet bind is a debt instrument w hose entire principal value is paid all at once on the maturity date, as opposed to amortizing the bond over its lifetime. Bullet Bonds cannot be redeemed early by an issuer, which means they are non-callable. Because of this, bullet bonds may pay a relatively low rate of interest due to the issuer's interest rate exposure. *See,* https://www.investopedia.com/terms/b/bulletbond.asp.

87.     Investors like Plaintiff do not participate in the FFB Issuance Process, except in rare instances when they participate in auctions. Instead, they typically transact with Approved FFB Dealers to invest in FFBs.

88.     When underwriters sell new FFBs directly to other dealers for the first time on offer day before those FFBs are declared "free to trade," these sales are said to occur in the primary market. After a syndicate is terminated and the new issue is declared free to trade, secondary market trading has commenced. The secondary market also includes sales by investors to dealers of older issues that the investor has decided to sell rather than hold until maturity, and purchases by investors from dealers of such older issues.

### D.     Defendants Controlled the Supply of FFBs.

89.     Defendants controlled a substantial portion of FFB supply because they purchased a large proportion of FFBs from Fannie Mae and Freddie Mac. As explained above, Approved FFB Dealers that participate in an FFB underwriting syndicate secure substantial allocations of FFB supply that they subsequently make available to investors. Accordingly, an Approved FFB Dealer's share of FFB underwriting correlates with the amount of FFB inventory that the Approved FFB Dealer can use to trade FFBs with investors.

90.     Data published by the Federal Reserve Bank of New York (the "FRBNY") further demonstrates that the FFB market is highly concentrated among the largest FFB dealers. The FRBNY published a report on transaction volume in the market for "agency debt securities"  that breaks down the market share percentage for the top 10 dealers in the agency debt securities market. [15] The report shows that the top 10 dealers by market share accounted for 98.90% of all

---

[15] The NYFRB classifies FFBs as agency debt (https://www.newyorkfed.org/markets/domestic-market-operations/monetary-policy-implementation/agency-debt-securities).

reported transactions of non-coupon bearing agency debt securities, a category that includes short-term FFBs.

91.     The data also shows that the top ten dealers by market share accounted for 81.35% of all reported transactions of agency debt securities that pay coupons, a category that includes medium-term and long-term FFBs.

92.     This large concentration in the primary market gave Defendants control over the FFB supply available to investors in the secondary market. It also gave Defendants the ability to fix the prices that investors paid for FFBs, and the motive and opportunity to fix FFB prices to generate supra-competitive FFB trading profits.

**E.     FFB Pricing**

93.     The market price of an FFB at any given time is calculated by comparing the yield to maturity offered by the FFB with the yield offered by other, similar debt instruments. Investors and dealers in the FFB market often use U.S. Treasury securities as a comparison to determine FFB prices.

94.     Interest rates and bond prices have an inverse relationship. As interest rates increase, the prices of FFBs decrease to reflect the fact that an investor can earn a greater amount of interest by purchasing a new debt instrument at the higher prevailing interest rate. Conversely, as interest rates decrease, the prices of existing FFBs increase to reflect the fact that the amount of interest offered by the existing FFB is greater than the amount of interest an investor could earn by purchasing a new debt instrument at the prevailing interest rate.

95.     FFBs are OTC debt. What this means is that employees at a trading desk[16] within the Approved FFB Dealer's FFB business are generally responsible for determining FFB price

---

[16] All Defendants operate trading desks that specialize in FFB trading and sales. Within that sales and trading business the same employees for each Defendant which deal with one type of FFB also deal all other kinds

quotes offered to investors. The Approved FFB Dealer can send the price quote to the investor without disseminating the price quote to the investing public. Despite the vast size of the market, trades are typically conducted over the phone or by message, person to person.

96.     Investors do not see FFB price quotes in real-time, and thus cannot evaluate prices quoted by multiple dealers without a substantial delay.

97.     As the largest Approved FFB Dealers, Defendants profit by dealing FFB inventory to customers in the primary and secondary markets. Approved FFB Dealers profit from trading FFBs with investors by keeping the difference between the price that the Approved FFB Dealer pays to purchase an FFB and the price at which the Approved FFB Dealer sells an FFB to a customer.

98.     Defendants typically quote FFB prices in the form of a "bid-ask spread." The bid price indicates the price at which the dealer is willing to buy a given FFB from a customer, and the ask price represents the price at which a dealer is willing to sell the same FFB to that customer. By buying at a lower price and selling at a higher price, Defendants profit from the difference. The wider the bid-ask spread, the greater the profit for the Defendant in an FFB transaction and the higher the cost for the customer.[17]

99.     Two factors affect the size of the bid/ask spread (1) market liquidity and (2) market volatility. For example, as market liquidity decreases the size of the bid/ask spread widens, and the costs of participating in the market for consumers increases. The same is true for

---

of FFBs. Thus the same employees are able to determine the price charged to their investor customers, like Plaintiff, for FFB transactions for all types of FFBs.

[17] Carley Garner, *A Trader's First Book on Commodities* (2nd Ed.) at pp. 33-34 (2013) ("Bid/ask spreads hinder a trader's ability to make money; the winder the spreads, the more difficult it is to be profitable.").

higher volatility when the broker faces more price risk and thus requires a higher

compensation.[18]

100.    In competitive OTC bond markets, dealers compete against each other by offering

superior prices to customers in order to secure business. Competition keeps bid-ask spreads

within a relatively narrow range, since any dealer that unilaterally quotes inferior prices to

customers will lose business to competitors.

## II.    DEFENDANTS CONSPIRED TO FIX FFB PRICES CHARGED TO INVESTORS

### A.    The DOJ Is Conducting a Criminal Price-Fixing Investigation into the FFB Market

101.    In June of 2018 it was reported that the DOJ Antitrust Division was conducting a

criminal investigation into collusion among dealers to fix FFB prices.[19]

102.    It was revealed that the investigation concerns the prices that dealers in the FFB

market charged to investors, such as Plaintiff and the Class. Specifically, the investigation was

focusing on illegal activities of bank traders suspected of coordinating to benefit the institutions

they work for.

### B.    Features of the FFB Market Fostered Collusion Among Defendants

103.    Defendants had the ability to use secretive communications, such as multi-user

electronic chat rooms, to maintain their collusive price-fixing scheme and coordinate in real time

to share proprietary customer information and align their pricing.

104.    Fannie Mae and Freddie Mac monitored Defendants' performance in the

secondary market and awarded underwriting privileges based on success in the secondary

---

[18] *Id.*

[19] https://www.bloomberg.com/news/articles/2018-06-01/trading-in-fannie-freddie-bonds-is-said-to-be-probed-by-u-s; *see also*, Joshua Sisco, *Comment: Authorities eye underwriting syndicates as finance stays in antitrust spotlight* (June 15, 2018) *available at* http://www.mlex.com/PlaintiffLitigation/DetailView.aspx?cid=997832&siteid=188&rdir=1.

market. This connection between the underwriting process and the secondary market gave

Defendants a motive to conspire to raise and fix prices in the secondary market.

105.    OTC markets are susceptible to collusion among dealers for several reasons.[20]

Unlike in central exchange-based markets like the stock market, investors like Plaintiff and the

Class lack access to real-time pricing data. This limited investors' ability to search for superior,

non-cartel prices and enhanced the efficacy of Defendants' conspiracy.

106.    Because the FFB market is not a transparent market, Defendants were able to

charge fixed prices without revealing their conspiracy to their customers.

107.    In an OTC market, customers typically contact only a limited number of dealers

before transacting. Furthermore, the time required to navigate the OTC process provides dealers

with the opportunity to communicate and collude with one another before an order is executed.

108.    In January 2018, the Treasury Market Practices Group ("TMPG") issued its latest

set of recommendations for Best Practices for Treasury, Agency Debt,[21] and Agency Mortgage-

Backed Securities Markets. The stated goal of these best practices is to ensure integrity,

transparency, efficiency, liquidity, and "vigorous competition" in the Treasury, agency debt, and

agency mortgage-backed securities markets. The TMPG has issued best practice

recommendations encompassing FFBs nearly on an annual basis since 2010.

109.    The TMPG best practices recommendations are an acknowledgement that the

FFB market has opportunities for "illegal activities such as price manipulation," collusion, and

anti- competitive conduct. This is evident from the enumerated practices and trading strategies it

---

[20] Zhuo Zhong, *Reducing the opacity in over-the-counter-markets available at*
https://www.bankofcanada.ca/wp-content/uploads/2012/11/Zhong1.pdf ("the bid-ask spread in the noncompetitive
centralized market is positively correlated with the bid-ask spreads in the OTC market. This dependence implies that
dealers and the monopoly can collude to increase trading costs so as to profit from opaqueness.").

[21] *Available at*
*https*://www.newyorkfed.org/medialibrary/Microsites/tmpg/files/TMPG_BestPractices_012218.pdf.

cautions against, including misuse of confidential information and manipulative practices such as "painting the tape."[22]

110.    Defendants who engaged in any of these forms of market manipulation would have been able to buy at a lower price or sell at a higher price than they otherwise would have been able to. Further, Defendants' access to trade data provided Defendants a mechanism to monitor compliance with their price-fixing agreement by checking other cartel members' FFB transactions.

111.    The FFB traders and sales personnel at Defendants' respective offices had well-established relationships. They worked together regularly, over an extended period, as a small group of traders and salespeople operating in the same markets. Defendants' FFB traders and sales personnel were well-acquainted with each other and had pre-existing relationships based on time spent working together within one of the Defendant's FFB business.

112.    Other aspects of the FFB market also make it highly susceptible to collusion. There is a high level of industry concentration in the FFB market. Defendants are a small number of competitors who controlled the supply of FFBs.

113.    There are high barriers to entry into the FFB market. It is expensive to become an Approved FFB Dealer, and few banks can bear the costs and risks associated with carrying enough FFB inventory to serve as a dealer in the FFB market. Changes in prevailing interest rates and other factors can affect the value of FFBs held in a dealer's inventory, limiting the ability of smaller players to engage in large FFB trades or hold FFB inventory. In order to be a market maker in the secondary FFB market, much like the Defendants, one must have "a

---

[22] Painting the tape is a form of market manipulation whereby market players attempt to influence the price of a security by buying and selling it among themselves to create the appearance of substantial trading activity. https://www.investopedia.com/terms/p/paintingthetape.asp.

sufficiently large client base to get a good view of the flow of orders; the capacity to take on large principal positions; continuous access to multiple markets, including funding and hedging markets; the ability to manage risk, especially the risk of holding assets in inventory; and market expertise in providing competitive quotes for a range of securities."[23]

114.    These barriers to entry prevented non-cartel members from competing with Defendants' cartel on equal terms and luring customers by offering superior prices.

### C.    Prices and Other Economic Data Confirm the Existence and Impact of Defendants' Conspiracy

115.    The economic facts show prices for FFBs throughout the Class Period strongly suggest a successful price-fixing conspiracy that inflated the prices investors paid when buying FFBs and deflated the prices investors received when selling FFBs throughout the Class Period.

116.    Consistent with the focus of the DOJ Antitrust Division's investigation, research shows statistically significant economic facts of anomalies in FFB pricing that are inconsistent with normal, competitive market conditions. Specifically, the economic facts are consistent with Defendants: (1) fixing prices of newly issued FFBs in the week following each FFB issuance artificially higher; (2) fixing prices for on-the-run FFBs artificially higher in the period leading up to a new FFB issuance; and (3) quoting agreed-upon, artificially inflated bid-ask spreads to investors throughout the Class Period on all FFB transactions with investors.

### 1.    Defendants Fixed the Prices of Newly Issued FFBs

117.    In a competitive market, this difference should be especially small for Defendants' sales of newly issued FFBs made on the same day that Fannie Mae or Freddie Mac issued the FFBs ("offer days"). For these sales, only a short amount of time has passed (*i.e.*, less

---

[23] https://www.bis.org/publ/qtrpdf/r_qt1503i.pdf.

than one day) between the time when the Defendants purchased the FFB from Fannie Mae or Freddie Mac and the time when it sells the same FFB to an investor. Thus, the impact of new information, such as changes in prevailing interest rates, Fannie Mae's or Freddie Mac's creditworthiness, or liquidity is near zero.

118.    Pricing data for Fannie Mae Benchmark Notes and Freddie Mac Reference Notes[24] (collectively, the "Notes") represent over $400 billion of total FFB issuance and are among the most traded FFBs, accounting for over 2 million transactions out of 5.9 million total (33.9%) reported FFB transactions from March 1, 2010 through December 31, 2017. Defendants participated in underwriting 85.4% of these instruments from March 1, 2010 through April 27, 2014.

119.    The average difference between the price that Approved FFB Dealers paid to Fannie Mae or Freddie Mac for Notes and the price at which Approved FFB Dealers sold these Notes to investors on offer days from April 27, 2014 through December 31, 2017 was very small, averaging 0.4 cents.

120.    The average difference between the price that Approved FFB Dealers paid to Fannie Mae or Freddie Mac for Notes and the prices at which Approved FFB Dealers sold these newly issued Notes to investors on offer days before April 27, 2014. This difference was 3.2 cents.

121.    Thus, the prices that Defendants charged investors for newly issued Notes on offer days was eight times higher before April 27, 2014 than after. The substantial decrease in

---

[24] "Reference Notes securities are one of Freddie Mac's term debt products, offering investors fixed-rate debt from two through ten years." http://www.freddiemac.com/debt/products/reference-notes.html.

the prices of newly issued Notes after the Class Period would not have been observed in a competitive market.

122.    Regarding all FFBs issued after March 1, 2010, a significant difference is observed between the price that each Approved FFB Dealer Defendant paid Fannie Mae or Freddie Mac for FFBs and the price at which the same Approved FFB Dealer Defendant sold these FFBs to investors both before and after April 27, 2014. Each Defendant charged significantly higher prices for newly issued FFBs it sold to investors during the Class Period compared to after April 27, 2014.

123.    In addition, an increase is observed in prices that Defendants charged for newly issued FFBs relative to the yields offered by U.S. Treasury securities with comparable maturities. U.S. Treasury securities carry a similar amount of credit risk as FFBs.

124.    Prices of U.S. Treasury securities are affected by the same macroeconomic factors and market conditions as FFBs. For example, changes in the credit condition of the U.S. federal government and prevailing interest affect FFBs and U.S. Treasury securities similarly.

125.    For each FFB issuance the difference between the price that each Approved FFB Dealer charged to investors for newly issued FFBs and the price that the same Approved FFB Dealer charged to investors for newly issued U.S. Treasury securities of a comparable maturity.

126.    The inflated prices that Defendants charged for newly issued FFBs on offer days were highly abnormal as compared to the yields offered by U.S. Treasury securities of comparable maturities.

**2.    Defendants Fixed the Prices of the Previously Issued FFBs Just Before They Went "Off-the-Run" to Create an Artificial Benchmark.**

127.    Fannie Mae and Freddie Mac typically issue FFBs using a predictable, regular schedule. Newly issued FFBs of a given type generally have similar features to existing FFBs except that they mature at a later date. Thus, the prices of newly issued FFBs are closely correlated with the prices of FFBs with similar characteristics that have been previously issued.

128.    This correlation between the prices of previously issued FFBs and newly issued FFBs with comparable features created an opportunity for Defendants' conspiracy to increase the market value of new FFB supply by inflating the market price of FFBs with similar features that were about to go "off-the-run."

129.    After April 27, 2014, the prices of FFBs that were about to go "off-the-run" traded at lower prices than newly issued FFBs. This price difference occurs because the market for on-the-run FFBs is generally more liquid (*i.e.*, larger transaction volume) than the market for off-the-run FFBs. Investors prefer to invest in more liquid FFBs because an investor has a higher likelihood of finding a buyer for these instruments at the market price should the investor decide to sell. Because demand is higher for on-the-run FFBs than for off-the-run FFBs, prices of on-the-run FFBs are also generally higher.

130.    Thus, in a competitive market, demand (and therefore price) of FFBs that are about to go off-the-run should be relatively low in the days leading up to a new issuance of FFBs with similar features because investors would prefer to purchase FFBs from the new issuance.

131.    However, that is not what occurred on and before April 27, 2014. Notes that were about to go off-the-run exhibited an anomalous increase in price in the days leading up to a new

issuance of Notes. Specifically, Notes about to go off-the-run consistently experienced a statistically significant price increase in the two days immediately leading up to a new issuance.

132.    A way to isolate Defendants' price inflation of Notes about to go off-the-run and account for any other potential macroeconomic factors is to compare the prices Defendants charged to their customers for these FFBs and the prices that Defendants charged to each other for the same Notes. This comparison shows that the price inflation for Notes about to go off-the-run only occurred in transactions involving *customers*. In otherwise identical transactions between Defendants, no price inflation occurred.

133.    As with prices for newly issued Notes, price inflation for Notes that were about to go off-the-run dissipated beginning after April 27, 2014.

134.    Defendants' practice of charging inflated prices to their customers for FFBs that were about to go off-the-run while charging lower prices to their horizontal competitors provides further evidence of anticompetitive conduct.

### 3.    Defendants Fixed Bid-Ask Spreads for FFBs at Artificially Wide Levels.

135.    Defendants also agreed to charge inflated bid-ask spreads for FFBs that they traded with investors. This enabled Defendants to earn artificially inflated profits on all FFB transactions that they entered with Plaintiff and the Class throughout the Class Period, causing Defendants' customers to overpay or not receive enough on every FFB transaction.

136.    In a competitive market, dealers compete by offering narrower bid-ask spreads to customers. If a dealer charges wider bid-ask spreads – by either lowering the bid price and/or raising the ask price – it should lose customers to rivals offering tighter spreads.

137.    When dealers agree to fix bid-ask prices, they conspire to artificially raise the bid when a customer sought a bid or lower the ask when a customer sought an ask, or both. Another

method is to agree to offer a particular bid-ask quote (*e.g.*, 99.93/100.07 for FFBs) or agree to charge a minimum bid-ask spread (*e.g.*, 14 basis points). In all cases, the dealers are better off because they can guarantee a consistent profit margin on each transaction and avoid losing customers to competition from rivals who are willing to offer superior prices and narrower bid-ask spreads.

138.    As explained above, bid-ask spreads normally decrease as liquidity increases to reflect a lower liquidity premium. However, just the opposite occurred in the FFB market prior to April 27, 2014. As liquidity increased, bid-ask spreads became ***wider***. This is exactly the reverse of what occurs in competitive financial markets but makes sense in the context of Defendants' agreement to quote inflated bid-ask spreads. As liquidity increased, Defendants' ability (by providing more opportunities to quote fixed prices) and motive to profit (through greater transaction volume) from inflating bid-ask spreads also increased. Defendants responded to greater liquidity by agreeing to maintain wider bid-ask spreads, thereby earning additional profits on each FFB transaction with customers as liquidity increased.

139.    The effect of Defendants' conduct on bid-ask spreads can be observed in the bid-ask spreads that Defendants quoted in "riskless principal" transactions. A riskless principal transaction is a trade where a dealer purchases an FFB after it has already agreed to sell the FFB to a customer or vice-versa, and therefore never bears any liquidity risk associated with carrying that FFB. Analyzing riskless principal transactions is useful for measuring the impact of Defendants' conspiracy on bid-ask quotes because these transactions are not impacted by liquidity premiums or changes in market conditions.

140.    Defendants behavior created an artificially wide bid-ask spreads quoted to investors, including Plaintiff and Class members, during the Class Period.

**D.     Defendants Failed to Adequately Supervise Their Trading and Sales Business During the Class Period.**

141.     Defendants were well-versed in how to manipulate the FFB market, as they were able to use the same playbook they have used many times before to engage in similar price-fixing conspiracies in various financial markets. Like here, these prior (or in some case simultaneous) illicit behaviors led government investigators to find deficiencies in oversight and control at Defendants' trading and sales businesses. These ongoing investigations have resulted in criminal trials and convictions, billions of dollars in fines, and successful litigation by injured investors.

142.     Foreign Exchange ("FX") Market Manipulation**:** In the fall of 2013, it was announced that government regulators were investigating the possible manipulation of the FX market. The scope of the investigation expanded rapidly, moving from a domestic investigation to one that included authorities from around the world.

143.     Starting in November of 2014, there was a series of orders entered against the Defendants for their role in manipulating the FX markets. Both the Commodity Futures Trading Commission ("CFTC") and FCA imposed over $3.2 billion in fines on Defendant Citi, Defendant HSBC, Defendant JPMorgan, RBS, and UBS for their role in the manipulation of the FX market; the Office of the Comptroller of the Currency ("OCC") fined Defendant Bank of America, Defendant Citi, and Defendant JPMorgan another $950 million; and the Financial Market Supervisory Authority ("FINMA") fined UBS $141 million.

144.    By May of 2015, Defendants Barclays, Citi, JPMorgan, RBS, and UBS were fined a total of $3 billion by the DOJ, and each pled guilty to criminal conspiracy charges for manipulating FX rates.[25]

145.    On January 25, 2018, Defendant BNP Paribas pleaded guilty to conspiring to fix prices in the FX market in violation of the Sherman Act.

146.    US Dollar LIBOR/Euribor/Yen LIBOR/Swiss Franc LIBOR manipulation: Government investigations and civil lawsuits have revealed widespread collusion among banks, including the Defendant banks, to manipulate benchmark interest rates for multiple currencies (U.S. Dollar LIBOR, Euribor, Yen LIBOR, Swiss franc LIBOR) during the Class Period. These private and public investigations have led to dozens of fines and settlements for price fixing by the following corporate parents of Defendants here who failed to detect and prevent anticompetitive conduct by trading and sales staffs within their subsidiaries: Barclays PLC, Bank of America Corporation (the parent of Defendants BANA and Merrill Lynch), Deutsche Bank AG (the corporate parent of Defendant DB Securities), UBS AG, JPMorgan Chase & Co., and Citigroup Inc.[26]

147.    ISDAfix manipulation: The ISDAfix, like the various LIBOR rates mentioned above, is a key interest-rate benchmark, designed to represent current market fixed rates for interest rate swaps of various terms.

---

[25] Plea Agreement, *U.S. v. Barclays*, No. 15-cr-00077 (D. Conn. May 20, 2015); Plea Agreement, *U.S. v. Citicorp*, No. 15-cr-00078 (D. Conn. May 20, 2015); Plea Agreement, *U.S. v. The Royal Bank of Scotland*, No. 15-cr-00080 (D. Conn. May 20, 2015); Plea Agreement, *U.S. v. UBS AG*, No. 15-cr-00076 (D. Conn. May 20, 2015); Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, *In the Matter of Barclays Bank PLC*, CFTC Dkt. No. 15-25 (May 20, 2015).

[26] *In the Matter of Barclays PLC,*, CFTC Docket No 12-25 (C.F.T.C. June 27, 2012); *In the Matter of UBS AG*, CFTC Docket No. 13-09 (C.F.T.C. Dec 19, 2012) *European Commission Press Release,* Antitrust: Commission fines banks €1.7.1 billion for participating in cartels in the interest rate derivatives industry. (Dec. 4, 2013).

148.    In 2013, the CFTC, the U.K. Financial Conduct Authority, and the German financial regulator BaFin were all investigating the manipulation of ISDAfix rates.

149.    By 2014, it was reported that the CFTC had told the DOJ that it had uncovered evidence of criminal behavior during its investigation of the alleged ISDAfix manipulation. This led the DOJ and other regulators to launch their own investigations.

150.    In May 2015, Barclays reached an agreement with the CFTC to pay $115 million for alleged manipulation of ISDAfix. In May 2016, Citi reached a similar agreement with the CFTC, agreeing to pay $250 million for alleged manipulation of ISDAfix. All the defendant banks—including Defendants BNP Paribas, Deutsche Bank, Nomura, and Wells Fargo— ultimately agreed to pay over $500 million to settle private antitrust claims alleging that they conspired to rig ISDAfix rates.

151.    <u>Sub-sovereign and supranational agency ("SSA") Bonds</u>: The DOJ investigation of price-fixing in the SSA market became public in December of 2015. The revelation of the DOJ investigation quickly prompted concurrent cartel investigations by the UK Financial Conduct Authority, the European Commission, and the filing of private lawsuits.[27] In August 2017, Deutsche Bank AG and Bank of America Corp. agreed to settle for a total of $65.5 million.

152.    <u>Mexican Government Bonds</u>: In April 2017, the Mexican antitrust regulator, the Comisión Federal de Competencia Económica ("COFECE"), announced that it uncovered evidence of anticompetitive conduct among dealers in the Mexican Government Bond ("MGB") market, including subsidiaries of Defendants Barclays Bank PLC, Citigroup Inc., JPMorgan

---

[27] https://www.bloomberg.com/news/articles/2018-12-20/four-banks-targeted-by-eu-antitrust-objections-over-ssa-bonds.

Chase & Co., and Bank of America Corp. At least one bank applied for, and was accepted, into the COFECE cartel leniency program after admitting to participation in the conspiracy. In November 2018, these banks were fined for simulating bond trades to artificially inflate trading volumes.[28]

153.    ANZ Equities: In June 2018, Australia and New Zealand Banking Group ("ANZ") and Defendants Deutsche Bank and Citigroup were charged by the Australia Competition and Consumer Commission (ACCC) with regard to an alleged cartel arrangement relating to trading in ANZ shares following an ANZ institutional share placement. After the issuance the three banks allegedly conspired and agreed to slowly trickle out the stock at an inflated price.[29]

154.    Swiss Franc Interest Rate Derivatives: The European Commission fined UBS AG, JPMorgan Chase & Co., and CS AG a total of €32.3 million for conspiring to fix bid-ask spreads in the market for interest rate derivatives denominated in Swiss francs. As outlined by the European Commission, the conspiracy involving UBS AG, JPMorgan Chase & Co., and CS AG is similar to the conspiracy alleged in this Complaint, involving an agreement among horizontal competitors in the OTC market for derivatives to charge inflated bid-ask spreads to customers.

## III.    ANTITRUST INJURY

155.    Plaintiff and the Class are domestic consumers of FFBs. They purchased and sold hundreds of millions of dollars' worth of FFBs in the United States during the Class Period, directly with each Defendant.

---

[28] https://www.reuters.com/article/mexico-bonds-manipulation/mexico-fines-global-banks-for-inflating-bond-trading-volumes-idUSL2N1XO22J.

[29] https://www.bbc.com/news/world-australia-44326034; *see also* Joshua Sisco, *Comment: Authorities eye underwriting syndicates as finance stays in antitrust spotlight* (June 15, 2018) *available at.* http://www.mlex.com/PlaintiffLitigation/DetailView.aspx?cid=997832&siteid=188&rdir=1.

156.    As described above, Defendants fixed the prices of FFBs during the Class Period for their own profit.

157.    As a direct result of Defendants' misconduct, Plaintiff and members of the Class were overcharged each time they purchased FFBs from Defendants and underpaid each time they sold FFBs to Defendants. Thus, as set forth in more detail below, Plaintiff and members of the Class were injured and suffered harm in each FFB transaction conducted during the Class Period.

### CLASS ACTION ALLEGATIONS

158.    Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on its own behalf and as representative of the following Class:[30]

> All persons or entities who transacted in Fannie Mae or Freddie Mac bonds during the period of at least January 1, 2009 through April 27, 2014 (the "Class Period") with a Defendant, where such persons or entities were domiciled in the United States or its territories. Excluded from the Class are the Defendants and any parent, subsidiary, affiliate, employee, agent or co-conspirator of any Defendant.

159.    The Class is so numerous that the individual joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, Plaintiff is informed and believe that at least thousands of geographically dispersed Class members transacted in FFBs during the Class Period at artificial prices due to Defendants' conspiracy.

160.    Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the Class sustained damages arising out of Defendants' common course of conduct in violation of law as complained of herein. The injuries and damages of each member of the

---

[30] The class definition is based on currently available information and Plaintiff reserves the right to amend the definition of the Class, including, without limitation, the Class Period.

Class were directly caused by Defendants' wrongful conduct in violation of the laws as alleged herein.

161.    Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff is an adequate representatives of the Class and has no interests that are adverse to the interests of the Class.

162.    Plaintiff has retained counsel competent and experienced in class action litigation, including antitrust class action litigation concerning collusion in financial markets.

163.    Common questions of law and fact exist as to all members of the Class, which predominate over any questions affecting solely individual members of the Class. These common questions of law and facts include, without limitation:

a.    whether Defendants' collusion caused FFB prices to be artificial during the Class Period;

b.    whether Defendants' unlawful acts violate Section 1 of the Sherman Act;

c.    whether Defendants' unlawful conduct caused injury to the business or property of Plaintiff and the Class;

d.    the operative time period and extent of Defendants' foregoing violations; and

e.    whether such injury or the fact or extent of artificiality in FFB prices caused by Defendants' conduct may be established by common, class-wide means, including, for example, by regression analysis, econometric formula, or other economic tests.

164.    A class action is superior to other methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims

41

in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many class members who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

165.    Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

166.    The statutes of limitations governing Plaintiff's claims were tolled under the doctrine of fraudulent concealment until at least June 2018, when it was revealed that the DOJ Antitrust Division was investigating price-fixing in the market for FFBs. The doctrine applies here because Defendants fraudulently concealed their misconduct through their own affirmative acts, and because Defendants' conduct was inherently self-concealing.

167.    Defendants actively concealed their violations of law from Plaintiff and the Class by, *inter alia*: (i) relying on non-public forms of communication, such as private electronic messages and telephone calls; (ii) implicitly representing that the FFB pricing quotes Defendants supplied to Plaintiff and the Class were the product of honest competition and not fixed by a conspiracy; and (iii) affirmatively misrepresenting that they complied with applicable laws and regulations, including antitrust laws. Below is a non-exhaustive list examples of such statements that each Defendant published during the Class Period:

a.  Barclays PLC, reporting on behalf of Barclays Bank PLC and BCI, reported in its 2010 Annual Report that it "operate[s] a system of internal control which provides reasonable assurance of effective and efficient operations covering all controls, including financial and operational controls and compliance with laws and regulations." Barclays PLC claimed that it "acknowledges that free and fair competition is good for business and customers and clients, driving innovation and improvements in service provision."

b.  Bank of America Corporation, reporting on behalf of BANA and Merrill Lynch, wrote in its 2010 Annual Report that it operated a program "consistently applied across the Corporation . . . to manage compliance risk." It also reported that it maintained an independent "Corporate Audit function" to "provide reasonable assurance" that "employees' actions are in compliance with . . . applicable laws and regulations." It further claimed that it emphasized a "culture of compliance" across the organization, including at BANA and Merrill Lynch.

c.  Citigroup Inc. implemented a "Citi Code of Conduct" during and after the Class Period. The Citi Code of Conduct applied to all entities affiliated with Citigroup Inc., including CGMI, and stated that Citigroup Inc. and its affiliates were "committed to promoting free and competitive markets." In its 2010 Annual Report, Citigroup Inc. claimed that it "monitor[ed] and control[led]" employee conduct, which included employees of CGMI, through "compliance and legal reporting systems, internal controls, management review processes and other mechanisms."

d.  Credit Suisse Group AG, reporting on behalf of CS AG and CS Securities, boasted that it had developed a "strong compliance culture" during the Class Period. It wrote in its 2010 Annual Report that it continued to "proactive[ly] develop[] [its] compliance framework [to] position[ it] well to respond to evolving regulation in the markets in which [it] operate[s]." Credit Suisse Group AG also emphasized that its "compensations practices and plans . . . are consistent with and promote effective risk management practices as well as [its] compliance and control culture." It published an updated Code of Conduct in 2010 "to place a greater emphasis on the values and professional standards underpinning our control and compliance."

e.  DB AG, which reports on behalf of DB Securities, wrote in its 2010 Annual Report that it maintained a "Regional Management" group responsible for both local and corporate-wide "compliance with regulatory and control requirements." DB AG also represented that it was "in compliance with the German laws that are applicable to [its] business in all material aspects." Price-fixing agreements among horizontal competitors are prohibited under German law.

f.  Goldman Sachs Group Inc., which reports on behalf of Goldman Sachs, wrote in its 2010 Annual Report that it "monitor[s] and control[s] [its] risk exposure through a risk and control framework encompassing a variety of separate but complementary financial, credit, operational, compliance and legal reporting systems, internal controls, management review processes and other mechanisms." Goldman Sachs Group Inc. further claimed that "compliance with the law is the minimum standard to which we hold ourselves." Goldman Sachs Group Inc. also

44

published a Code of Conduct during the Class Period that purportedly required "fair and ethical competition" by its employees, including employees of Goldman Sachs, and prohibited "manipulation" and "unfair dealing practice[s]."

g. JPMorgan Chase & Co. published a "Code of Conduct" during the Class Period that applied to "all its direct and indirect subsidiaries." In the Code of Conduct, JPMorgan Chase & Co. claimed that it was "committed to complying with the letter and spirit of applicable competition laws wherever we do business." JPMorgan Chase & Co., which reports on behalf of JPM NA and JPMS, reported in its 2010 Annual Report that its Audit Committee "reviews with management the system of internal controls that is relied upon to provide reasonable assurance of compliance with the Firm's operational risk management processes." It further assured investors that it "has established policies and procedures, and has in place various oversight functions, intended to promote the Firm's culture of 'doing the right thing.'"

h. First Tennessee and FTN Financial reported under First Horizon's 2010 Annual Report that First Horizon had "[m]anagement processes, structure, and policies are designed to help ensure compliance with laws and regulations as well as provide organizational clarity for authority, decision-making, and accountability." First Horizon also reported having a risk management team that "monitor[s] business practices in relation to those [establish[ed] appropriate operating standards." It also wrote in its Code of Conduct that it prohibited "manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any unfair dealing practice."

i.  BNP Paribas SA, which reports on behalf of subsidiaries including BNP Securities, wrote in its 2010 Annual Report that it had in place a "complex internal control governance structure involving the Board of Directors, through various Committees," to purportedly ensure an effective internal compliance system. BNP Paribas SA published a 2011 Code of Conduct where it wrote that it prohibited "market manipulation" and required "natural[] compl[iance] with the laws, regulations and professional standards" from its employees, including employees of BNP Securities.

j.  UBS AG, which reports on behalf of UBS Securities, boasted in its 2010 Annual Report that it "pursue[s] the highest levels of compliance through extensive employee training and investment in risk management processes and standards." Additionally, it emphasized that it evaluated its employees "base[d]" in part on "whether they . . . operate with a high level of integrity and in compliance with UBS policies." UBS Securities also claimed in its global Code of Business Conduct and Ethics that it was "committed to . . . complying with relevant laws, rules and regulations, including applicable antitrust and competition laws."

168.   Defendants' conspiracy was inherently self-concealing because it relied on secrecy for its successful operation. Had the public learned that Defendants conspired to fix prices in the FFB market, their conspiracy could not have continued for as long as it did. Accordingly, Plaintiff could not have learned of Defendants' anticompetitive conduct prior to June 2018, when confidential sources revealed that the DOJ Antitrust Division was investigating dealers for fixing the prices of FFBs purchased and sold by investors.

169.    Because of Defendants' fraudulent concealment, Plaintiff and the Class were not aware of Defendants' misconduct and could not have discovered it through the exercise of due diligence until June 2018, when the DOJ's price-fixing investigation was revealed publicly for the first time. Accordingly, Plaintiff asserts that the applicable statutes of limitations on Plaintiff's claims were tolled. Defendants are also equitably estopped from asserting any statute of limitations defense.

## CLAIMS FOR RELIEF
### FIRST CLAIM FOR RELIEF
**(For Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.*)**
**(Against All Defendants)**

170.    Plaintiff incorporates by reference and re-alleges the preceding allegations, as though fully set forth herein.

171.    Defendants and their unnamed co-conspirators engaged in a combination and conspiracy in an unreasonable and unlawful restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.*

172.    During the Class Period, Defendants controlled the supply of FFBs available to investors and were horizontal competitors in the FFB market.

173.    The combination and conspiracy consisted of a continuing agreement, understanding and concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained, and charged artificial prices for FFBs to investors. Defendants' conspiracy is a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

174.    Defendants' conspiracy and resulting impact on FFB prices paid by investors occurred in and affected U.S. interstate commerce.

175.    As a proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have suffered injury to their business or property. These injuries included, but were not limited to, paying artificial and non-competitive prices for FFBs as a proximate result of Defendants' anticompetitive conduct. Plaintiff and the Class were also deprived of the benefits of free and open competition in the FFB market.

176.    Plaintiff and members of the Class are each entitled to treble damages for the Defendants' violations of the Sherman Act alleged herein, and a permanent injunction restraining Defendants from engaging in additional anticompetitive conduct.

### SECOND CLAIM FOR RELIEF
#### (Unjust Enrichment in Violation of the Common Law)
#### (Against All Defendants)

177.    Plaintiff incorporates by reference and re-alleges the preceding allegations, as though fully set forth herein.

178.    Plaintiff and members of the Class transacted in FFBs during the Class Period directly with Defendants Barclays Capital, Inc.; Merrill Lynch, Pierce, Fenner, & Smith, Inc.; BNP Paribas Securities Corp.; Citigroup Global Markets Inc.; Credit Suisse AG; Credit Suisse Securities (USA) LLC; Deutsche Bank Securities Inc.; First Tennessee Bank, N.A., Goldman Sachs & Co. LLC; JPMorgan Chase Bank, National Association; J. P. Morgan Securities LLC; and UBS Securities LLC. These transactions were supposed to be priced based on competitive market forces and reflect honest competition by the Defendants.

179.    However, as alleged above, rather than competing honestly and aggressively with each other, Defendants colluded to fix the prices charged or remitted to Plaintiff and the Class in purchases and sales of FFBs.

180.    Defendants' collusion enabled them to collect supra-competitive profits on every transaction of FFBs with Plaintiff and the Class. At the same time, it caused Plaintiff and the Class to pay more (in the case of FFB purchases) and receive less (in the case of FFB sales) on their FFB transactions with Defendants.

181.    It is unjust and inequitable for Defendants to have enriched themselves in this manner at the expense of Plaintiff and the Class, and equity and good conscience require the Defendants to make restitution.

182.    Plaintiff and the Class therefore seek restoration of the monies of which they were unfairly and unlawfully deprived as described in this Complaint.

## PRAYER FOR RELIEF

Accordingly, Plaintiff demands relief as follows:

A.    For an order certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, designating Plaintiff as the Class representative, and appointing its counsel as Class counsel;

B.    For the unlawful conduct alleged herein to be adjudged and decreed to be an unlawful restraint of trade in violation of Section 1 of the Sherman Act;

C.    For Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint;

D.    For a judgment awarding Plaintiff and the Class damages against Defendants for Defendants' violations of the federal antitrust laws, in an amount to be trebled in accordance with such laws;

E.      For an award to Plaintiff and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

F.      For such other and further relief as the Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff respectfully demands a trial by jury of all issues so triable.

Dated: March 5, 2019                    Respectfully submitted,


      /s/ Linda P. Nussbaum
Linda P. Nussbaum (LN-9336)
Bart D. Cohen (*pro hac vice* forthcoming)
Fred T. Isquith (FI-1064)
NUSSBAUM LAW GROUP, P.C.
1211 Avenue of the Americas, 40th Fl.
New York, NY 10036
(917) 438-9189
lnussbaum@nussbaumpc.com
bcohen@nussbaumpc.com
fisquith@nussbaumpc.com

Michael J. Freed (*pro hac vice* forthcoming)
Robert J. Wozniak (*pro hac vice* forthcoming)
Brian M. Hogan (*pro hac vice* forthcoming)
FREED KANNER LONDON & MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
(224) 632-4500
mfreed@fklmlaw.com
rwozniak@fklmlaw.com
bhogan@fklmlaw.com

Jayne A. Goldstein (*pro hac vice* forthcoming)
SHEPHERD FINKELMAN MILLER & SHAH LLP
1625 N. Commerce Parkway, Suite 320
Fort Lauderdale, FL 33326
(954) 515-0123
jgoldstein@sfmslaw.com

*Counsel for Plaintiff and the Proposed Class*